UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID B. SULLIVAN AND DONNA L.      *
BECK,      *
    *
    Plaintiffs,      *
    *
    v.      *
    *      Civil Action No. 14-14074-MGM
THE BANK OF NEW YORK MELLON      *
CORPORATION FKA THE BANK OF      *
NEW YORK, as Trustee for the Sasco      *
2005-16 Trust Fund, and NATIONSTAR      *
MORTGAGE, LLC,      *
    *
    Defendants.      *

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS
(Dkt. No. 17)

March 19, 2015

MASTROIANNI, U.S.D.J.

## I.     INTRODUCTION

David B. Sullivan and Donna L. Beck ("Plaintiffs") brought this action in state court against

the Bank of New York Mellon Corporation FKA The Bank of New York, as Trustee for the Sasco

2005-16 Trust Fund, and Nationstar Mortgage, LLC (together, "Defendants"). On November 4,

2014, Defendants removed the action to this court pursuant to 28 U.S.C. § 1441.

Plaintiffs' claims arise out of a mortgage dispute and threatened foreclosure sale of their

home.[1] In particular, Plaintiffs assert in their amended complaint claims for breach of contract

(Count I), violation of M.G.L. c. 183, § 21 (Count II), violation of M.G.L. c. 244, § 35A (Count III),

---

[1] In addition to their complaint, Plaintiffs had also filed a motion for preliminary injunction in state court. At the hearing on Defendants' motion to dismiss the amended complaint, however, Defendants informed the court that the foreclosure sale scheduled for January 16, 2015 had been canceled. The parties therefore agreed that the motion for preliminary injunction, which sought to prevent the foreclosure sale from going forward, was moot, and the court denied the motion without prejudice. (See Dkt. No. 32.)

violation of M.G.L. c. 244, § 35B (Count IV), wrongful foreclosure (Count V), breach of implied covenant of good faith and fair dealing (Count VI), violation of M.G.L. c. 93A (Count VII), and negligence (Count VIII).[2] Defendants have filed a motion to dismiss asserting that Plaintiffs' amended complaint fails to state a claim upon which relief may be granted. For the following reasons, the court will grant Defendants' motion in part and deny it in part.

## II. BACKGROUND

The following facts come directly from Plaintiffs' amended complaint.[3] On June 28, 2005, David Sullivan purchased property in Monson ("Property") for $280,500 with two simultaneous loans from E-Loan, Inc. (Dkt. No. 16, Am. Compl. ¶¶ 4, 10.) The first loan was in the amount of $224,400, which was 80% of the purchase price of the Property. (Id. ¶ 11.) It was for a term of thirty years, with monthly payments for the first ten years going towards interest only; the monthly payments started at $1,075.25, but after ten years they were scheduled to increase to $1,575.48. (Id.) Sullivan is the only borrower on the note for the first loan. (Id. ¶ 12.) This loan was secured by a mortgage given by both Plaintiffs, dated June 29, 2005 ("First Mortgage"), and the mortgagee under the First Mortgage is listed as Mortgage Electronic Registration Systems, Inc. ("MERS"), acting

---

[2] Plaintiffs also asserted a claim for intentional or negligent infliction of emotional distress (Count IX), but they failed to oppose dismissal of this claim in their opposition brief. Furthermore, at the second hearing on the instant motion, held on January 22, 2015, Plaintiffs' counsel confirmed that Plaintiffs do not oppose dismissal of the intentional infliction of emotional distress claim. To the extent this concession does not extend to a negligent infliction of emotional distress claim, the court notes that such claim fails for the same reason discussed with regard to Count VIII, Plaintiffs' freestanding negligence claim: a lack of duty. See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 239-40 (1st Cir. 2013) ("Regarding Young's NIED claim, it is axiomatic that duty is a necessary ingredient of an action for negligence."); MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486, 495 (1st Cir. 2013) ("The relationship between a borrower and lender does not give rise to a duty of care under Massachusetts law."). The court will therefore dismiss Count IX of the amended complaint.

[3] In addition, the court has also reviewed certain exhibits attached to the Affidavit of David B. Sullivan (Dkt. No. 1-3) and the Affidavit of Hugh Heisler (Dkt. No. 1-4)—both of which were filed with Plaintiffs' motion for preliminary injunction—because the amended complaint cites the affidavits which, in turn, often cite these exhibits. See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st. Cir. 2008) ("[W]hen . . . a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged) that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998))). In any event, the incorporated portions of the affidavits and referenced exhibits largely reiterate the related allegations in the amended complaint.

solely as a nominee for E-Loan, Inc. (Id. ¶ 13.) Paragraph 22 of the First Mortgage provides, in relevant part, that

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . . The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to the Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. <u>The notice shall further inform Borrower of</u> the right to reinstate after acceleration and <u>the right to bring a court action to assert</u> <u>the non-existence of a default or any other defense of Borrower to acceleration and</u> <u>sale</u>. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law.

(Id. ¶ 14; Dkt. No. 1-3, Ex. 6 (emphasis added).)

The second loan from E-Loan, Inc. was in the amount of $56,100, which was 20% of the purchase price of the Property. (Dkt. No. 16, Am. Compl. ¶ 15.) Although the loan was termed a "Home Equity Line of Credit," the lender was aware that Sullivan would be borrowing the maximum principal amount to complete the purchase of the Property. (Id.) Sullivan is the only borrower under the note for the second loan. (Id. ¶ 16.) The second loan was also secured by a mortgage given by both Plaintiffs and also listed MERS as the mortgagee. (Id. ¶ 17.) The two loans were underwritten as part of a loan transaction in which the combined loan-to-value ratio was 100%. (Id.) Moreover, the Uniform Residential Loan Application signed by Sullivan shows the ratio of Plaintiffs' housing-related and recurring monthly debt to their monthly income exceeded 38%. (Id. ¶ 19.)

Plaintiffs believed at the time that they would be able to make the monthly payments, because Sullivan had recently obtained new job-related responsibilities as the Founding Director of the Western New England College Polling Institute and his employer assured him he would receive additional compensation. (Id. ¶ 20.) Unfortunately, however, Sullivan's compensation was not

increased, and Plaintiffs experienced significant increases in their personal and household expenses. (Id. ¶ 21.) Toward the end of 2009, Plaintiffs had nearly exhausted their savings in order to keep up with the two monthly mortgage payments. (Id. ¶ 22.) In November, 2009, Plaintiffs began requesting a modification of the terms of the mortgages from the companies servicing the two loans. (Id. ¶ 22.) Initially, Plaintiffs' First Mortgage was serviced by Aurora Loan Services LLC, but Nationstar took over as servicer around July 1, 2012. (Id. ¶ 23.)

Plaintiffs allege that, beginning in November, 2009, and continuing for approximately the next three and a half years, they repeatedly submitted applications for modifications and other debt relief to the servicing companies, along with all the documentation requested by the servicers to support the applications. (Id. ¶ 24.) However, long delays ensued without any word from the servicers and, in response to their numerous inquiries, Plaintiffs received form letters and electronic messages indicating the applications were still being processed or requesting documentation which had already been provided. (Id. ¶ 25.) On a number of occasions, the servicing companies refused to process Plaintiffs' Home Affordable Modification Program ("HAMP")[4] applications without first receiving income documentation from Beck, who was not a borrower under the original notes. (Id. ¶ 26.) On two different occasions, Plaintiffs received notification from Aurora that separate applications for a loan modification under HAMP had been denied for reasons which were false. (Id. ¶ 27.)

Thereafter, Plaintiffs received an offer of modification from Aurora which called for monthly payments approximately $400 higher than the existing monthly payments. (Id. ¶¶ 28-29.) Plaintiffs, desperate to avoid foreclosure, signed the second modification offered by Aurora on February 9, 2012 and made their first payment thereunder. (Id. ¶ 31.) The Loan Modification Agreement did not constitute a new loan but, rather, "amend[ed] and supplement[ed]" both the First

---

[4] "HAMP is a federal program intended to encourage lenders and loan servicers to offer loan modifications to certain eligible borrowers." Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 928 n.2 (1st Cir. 2014).

Mortgage, under which Beck and Sullivan are listed as borrowers, and the original note, under which only Sullivan is obligated as a borrower. (Id. ¶ 32.) The "Lender" under the Loan Modification Agreement is listed as Aurora Bank FSC, but that bank was not the current holder of the First Mortgage when the modification occurred. (Id. ¶ 33.) After entering into the Loan Modification Agreement, Plaintiffs recognized the payments were unaffordable and realized they would be unable to keep up with the scheduled payments, so they filed for bankruptcy to try to save their home. (Id. ¶ 34.)

In March, 2013, Plaintiffs each received from Nationstar: (1) a set of letters dated March 18, 2013 notifying them that they were in default on their first loan and requiring payment of $19,189.68 within 35 days or the full amount due on the loan would be accelerated; (2) a set of letters dated March 19, 2013 notifying them they were in default and requiring payment of $19,119.68 within 150 days or the full amount due on the loan would be accelerated; and (3) another letter dated March 19, 2013 notifying them of their right to request a modified mortgage loan. (Id. ¶ 35; Dkt. No. 1-3, Ex. 6.) In response, Plaintiffs submitted another request for a loan modification, along with all the completed forms and supporting documentation requested by Nationstar over the following two months. (Dkt. No. 16, Am. Compl. ¶ 36.) On the first page of Plaintiffs' Request for Mortgage Assistance ("RMA"), dated May 29, 2013, Plaintiffs highlighted the fact that Beck was not a co-borrower under the note and that she was listed on the RMA only because she is on the deed and is a "Borrower" on the mortgage. (Id. ¶ 37.) While Plaintiffs sent Nationstar all of the documentation requested, Plaintiffs were informed their application for a HAMP modification had been denied by Nationstar because they had not submitted required documentation. (Id. ¶ 38.) After Sullivan inquired further, Plaintiffs received a letter dated July 11, 2013 stating that their HAMP application had been rejected because they failed to provide certain documentation which Plaintiffs had already submitted to Nationstar and Aurora on multiple prior occasions. (Id. ¶ 39; Dkt. No. 1-3, Exs. 7 and

8.)  Again, among the requested documentation was income information for Beck, even though she was not a borrower under the original note.  (Dkt. No. 16, Am. Compl. ¶ 39; Dkt. No. 1-3, Ex. 8.) The letter also assured Plaintiffs that Nationstar had created a new HAMP case for Plaintiffs' mortgage account and that it would "happily review the account for payment assistance."  (Id.)

In August, 2013, Plaintiffs each received three letters from Nationstar dated August 21, 2013.  (Dkt. No. 16, Am. Compl. ¶ 40; Dkt. No. 1-3, Ex. 9.)  Similar to the March letters, the first letters indicated they were in default on their first loan and required payment of $28,976.58 within 35 days or the full amount due on the loan would be accelerated.  (Id.)  This letter also stated: "You are hereby informed that you have the right to 'cure' or reinstate the loan after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense you may have to acceleration and sale."  (Id. (emphasis added).)  The second letter indicated they were in default on their first loan and required payment of $28,905.58 (an amount slightly lower than that listed in the first letter) within 150 days or the full amount due on the loan would be accelerated. (Id.)  Appended to this letter was a page of "Additional Disclosures" which stated the current holder of Plaintiffs' mortgage was "The Bank of New York Mellon FKA the Bank of New York, as Trustee for the Sasco 2006-16 Trust Fund."  (Id.)  The third letter again notified Plaintiff of their right to request a modified mortgage loan and stated that Nationstar's records indicated Plaintiffs were eligible to request a mortgage modification.  (Id.)

In response, Plaintiffs again submitted a new loan modification application on August 25, 2013, along with all the required supporting documentation.  (Dkt. No. 16, Am. Compl. ¶ 41; Dkt. No. 1-3, Ex. 10.)  Plaintiffs, however, never received any further communication from Nationstar regarding their eligibility for a loan modification.  (Dkt. No. 16, Am. Compl. ¶ 42.)[5]  Moreover,

---

[5] Plaintiffs state in their amended complaint that "[t]he Defendants allege that Nationstar sent a letter to Plaintiff David Sullivan dated August 29, 2013 requesting additional documentation from him."  (Id. ¶ 43.)  "However," Plaintiffs allege, "neither of the Plaintiffs have any recollection of receiving this correspondence," despite the fact that they "have

Defendants never sent any correspondence to Plaintiffs reflecting a final determination on their application for HAMP modification and never took any steps to consider Plaintiffs for another foreclosure prevention alternative. (Id. ¶¶ 48-49.)

In late August or early September, 2014, Plaintiffs received separate notices dated August 29, 2014 informing them a foreclosure sale of their home had been scheduled for September 23, 2014. (Id. ¶ 50; Dkt. No. 1-3, Ex. 11.) This sale was canceled because the first notice was not published until September 4, 2014, which was less than the required twenty-one days prior to the scheduled sale date. (Dkt. No. 16, Am. Compl. ¶ 51.) Plaintiffs each received new notices dated September 25, 2014 informing them a foreclosure sale of their home had been scheduled for October 16, 2014. (Id. ¶ 52.) At an initial hearing in Superior Court on October 15, 2014, the parties mutually agreed to continue the hearing and Defendants agreed to postpone the foreclosure sale; the sale subsequently was rescheduled for December 11, 2014. (Id. ¶ 53.) Plaintiffs were notified by letter dated November 26, 2014 that Defendants had postponed the sale until January 16, 2015. (Id. ¶ 54.) On January 8, 2015, Defendants' counsel informed the court, at the hearing on the instant motion, that the foreclosure sale has since been temporarily canceled.

The following facts, which also come from Plaintiffs' amended complaint, relate to the Sasco 2006-16 Trust Fund and the assignment of the First Mortgage to Bank of New York. Shortly after Plaintiffs originally granted the First Mortgage to MERS, Bank of New York entered into a Pooling and Servicing Agreement ("PSA") dated August 1, 2005, creating a trust into which multiple mortgages would be pooled and securitized ("Trust"). (Id. ¶ 55.) The Trust was structured and

---

retained all correspondence they have received from Nationstar" and "conducted an exhaustive search of the Plaintiffs' records." (Id.) Defendants included this letter as an exhibit in support of their opposition to Plaintiffs' motion for preliminary injunction, which is presumably how Plaintiffs learned of it. (Dkt. No. 15, Ex. 9.) Looking at the facts in the light most favorable to Plaintiffs, the court infers, for purposes of this motion, that Plaintiffs never received this letter. In any event, as Plaintiffs explain, the letter states that Nationstar was missing documentation for all sources of income, an IRS 4506-T signed by borrowers, and the most recent quarterly or year-to-date profit and loss statement, but Plaintiffs included this material with the August 25, 2013 modification application. (Dkt. No. 16, Am. Compl. ¶¶ 44-46; Dkt. No. 1-3, Ex. 10.)

operated so as to achieve and maintain the status of a Real Estate Mortgage Investment Conduit ("REMIC") under the Internal Revenue Code ("Tax Code").  (Id. ¶ 56; Dkt. No. 1-4, Ex. 1.)  Under the terms of the PSA, Bank of New York assumed the role of "Trustee," Structured Asset Securities Corporation was the "Depositor," and Aurora Loan Services LLC was the "Master Servicer."  (Dkt. No. 16, Am. Compl. ¶ 57; Dkt. No. 1-4, Ex. 1.)  The Closing Date of the Trust was August 31, 2005.  (Dkt. No. 16, Am. Compl. ¶ 58; Dkt. No. 1-4, Ex. 1.)

The PSA provides the following.  On or before the Closing Date of the Trust, the Depositor would sell, transfer, and assign to Bank of New York, as Trustee, all of the Depositor's right, title, and interest in the mortgage loans which were scheduled to form the corpus of the Trust Fund.  (Dkt. No. 16, Am. Compl. ¶ 59; Dkt. No. 1-4, Ex. 1.)  The Depositor warranted Bank of New York that it held good title to each of the notes and corresponding mortgages as of the Closing Date.  (Dkt. No. 16, Am. Compl. ¶ 60; Dkt. No. 1-4, Ex. 1.)  The Trustee may only receive and accept the transfer or assignment of Mortgage Loans from the Depositor.  (Dkt. No. 16, Am. Compl. ¶ 61; Dkt. No. 1-4, Ex. 1.)  The Depositor must deliver to Bank of New York, as Trustee, the complete file on each mortgage loan, including the original note endorsed in blank without recourse, the original mortgage creating a first lien on the mortgaged property, an assignment of the mortgage in recordable form, and all recorded intervening assignments of the mortgage.  (Dkt. No. 16, Am. Compl. ¶ 62; Dkt. No. 1-4, Ex. 1.)  Within forty-five days of the Closing Date, Bank of New York, as Trustee, must complete a review of the Mortgage Files for each Mortgage Loan and produce an interim certification as to the completeness of the Mortgage Files.  (Dkt. No. 16, Am. Compl. ¶ 63; Dkt. No. 1-4, Ex. 1.)  If Bank of New York, as Trustee, did not receive the mortgage file for a loan, it could require the Depositor to repurchase the loan or provide a Substitute Mortgage Loan.  (Dkt. No. 16, Am. Compl. ¶ 64; Dkt. No. 1-4, Ex. 1.)  But no substitution could occur more than two years after the Closing Date and not unless the Trustee received an Opinion of Counsel that the

substitution would not jeopardize the favorable tax treatment accorded to the Trust as a REMIC. (Id.)  Bank of New York must act to maintain the status of the Trust as a REMIC under the Tax Code, and it may not take any action which would jeopardize such status.  (Dkt. No. 16, Am. Compl. ¶ 65; Dkt. No. 1-4, Ex. 1.)  Moreover, Bank of New York may not acquire any assets or accept any contribution after the Closing Date unless it first receives an Opinion of Counsel that any such acquisition or acceptance would not jeopardize the Trust's REMIC status.  (Dkt. No. 16, Am. Compl. ¶ 66; Dkt. No. 1-4, Ex. 1.)  The PSA is governed by the laws of the State of New York. (Dkt. No. 16, Am. Compl. ¶ 67; Dkt. No. 1-4, Ex. 1.)

Plaintiffs' First Mortgage was not assigned to Bank of New York, as Trustee, until March 12, 2014, which was more than 8 ½ years after the Closing Date of the Trust.  (Dkt. No. 16, Am. Compl. ¶ 68; Dkt. No. 1-4, Ex. 2 and 3.)  MERS executed an assignment of Plaintiffs' First Mortgage to Aurora Loan Services LLC on April 6, 2011, and Aurora Loan Services LLC assigned the Mortgage to Bank of New York on March 12, 2014.  (Id.)  There is no evidence the Depositor, Structured Asset Securities Corporation, ever received a transfer or assignment of Plaintiffs' First Mortgage or owned the mortgage at any time prior to or after the Closing Date of the Trust.  (Dkt. No. 16, Am. Compl. ¶ 69.)

Lastly, Plaintiffs allege they do not have alternative housing available, and the loss of their home through foreclosure would cause them to suffer immediate and irreparable harm for which they have no adequate remedy at law.  (Id. ¶ 70.)

### III.    STANDARD OF REVIEW

When confronted with a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must accept the well-pleaded allegations of the complaint as true, drawing all reasonable inferences in favor of the plaintiff.  See S.E.C. v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010).  A

complaint that states a plausible claim for relief, on its face, will survive a motion to dismiss.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

## IV.   ANALYSIS

### A.   Breach of Contract (Count I)

In Count I, Plaintiffs allege Defendants failed to provide them with notice of their right to bring a court action to assert a defense to acceleration of their loan and sale of their home in breach of paragraph 22 of the First Mortgage contract.  (Compare Dkt. No. 1-3, Ex. 6 ("The notice shall further inform Borrower of . . . the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.") with Dkt. No. 1-3, Ex. 9 ("You are hereby informed that you have . . . the right to assert in the foreclosure proceeding the non-existence of a default or any other defense you may have to acceleration and sale." ).)  Plaintiffs allege, as a result of the breach, Defendants have no legal right to conduct a foreclosure auction of their home.

Defendants argue the court should dismiss this claim because Plaintiffs have failed to plead facts suggesting there has been a material breach of the contract or that they have been harmed as a result.  According to Defendants, the difference in wording between a right to assert a defense in a "court action" as opposed to a "foreclosure proceeding" is immaterial, especially since a common definition of "proceeding" is a "legal action before a court of law."  Defendants also argue no harm resulted from any breach since Plaintiffs did bring a court action challenging the foreclosure sale. Plaintiffs contend that strict compliance with the terms of a mortgage contract is required under M.G.L. c. 183, § 21 before an entity may conduct a non-judicial foreclosure.  Plaintiffs further argue

a material breach occurred, as Massachusetts is a non-judicial foreclosure state and, therefore, contrary to the August 21, 2013 notice, there is no "foreclosure proceeding" at which a borrower may assert a defense. In addition, Plaintiffs argue there is no requirement for harm or prejudice in light of the strict compliance standard set forth in M.G.L. c. 183, § 21.

"In Massachusetts, a breach of contract is proven by a showing that (1) an agreement was made between the plaintiff and the defendant supported by valid consideration, (2) the plaintiff was ready, willing and able to perform, (3) the defendant failed to perform a material obligation under the agreement and (4) the plaintiff suffered damage as a result of defendant's failure to perform." Coady Corp. v. Toyota Motor Distribs., 346 F.Supp.2d 225, 248 (D. Mass. 2003). In order to recover, Plaintiffs must show a material breach of the contract and some harm resulting from the breach. Here, even if there has been a material breach, Plaintiffs have not alleged any harm and provided no authority for the proposition that M.G.L. c. 183, § 21 somehow modifies the normal requirements for a breach of contract claim. In short, it is clear that no harm resulted from the breach because Plaintiffs, by bringing this lawsuit, commenced the specific pre-foreclosure court action paragraph 22 mentioned but which was omitted from the August 21, 2013 notice.

Accordingly, the court will dismiss Count I of Plaintiffs' amended complaint.

B. Violation of M.G.L. c. 183, § 21 (Count II)

Plaintiffs allege the August 21, 2013 notice violated M.G.L. c. 183, § 21, requiring strict compliance "with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale." Plaintiffs allege Defendants may not proceed with foreclosure until they comply with the terms of the mortgage, i.e., until they send the correct notice required by paragraph 22.

Defendants seek dismissal of this claim asserting the notice substantially complied with paragraph 22 and that M.G.L. c. 183, § 21 does not mandate strict compliance here because paragraph 22 is not part of the statutory power of sale.

"The 'statutory power of sale' is set out in G.L. c. 183, § 21." Eaton v. Federal Nat'l Mortg. Ass'n, 969 N.E.2d 1118, 1127 (Mass. 2012). "Under this statute if a mortgage provides for a power of sale, the mortgagee, in exercising the power, may foreclose without obtaining prior judicial authorization 'upon any default in the performance or observance' of the mortgage . . . including, of course, nonpayment of the underlying mortgage note." Id. (quoting MASS. GEN. LAWS ch. 183, § 21). "Section 21 provides, however, that for a foreclosure sale pursuant to the power to be valid, the mortgagee must 'first comply[] with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale.'" Id. (quoting MASS GEN. LAWS. ch. 183, § 21). "In addition to G.L. c. 183, § 21, itself, the 'statutes relating to the foreclosure of mortgages by the exercise of a power of sale' . . . are set out in G.L. c. 244, §§ 11-17C." Id. at 1128 (quoting MASS GEN. LAWS. ch. 183, § 21).

> Recognizing the substantial power that the statutory scheme affords to a mortgage holder to foreclose without immediate judicial oversight, we adhere to the familiar rule that "one who sells under a power [of sale] must strictly follow its terms. If he fails to do so there is no valid execution of the power, and the sale is wholly void."

U.S. Bank Nat. Ass'n v. Ibanez, 941 N.E.2d 40, 49-50 (Mass. 2011) (quoting Moore v. Dick, 72 N.E. 967, 968 (Mass. 1905)).

As an initial matter, the court agrees with Plaintiffs that the August 21, 2013 notice sent by Defendants does not even substantially comply with the requirements of paragraph 22. At first glance, the discrepancy may appear trivial. Unlike in most states, however, "Massachusetts does not require a mortgage holder to obtain judicial authorization to foreclose on a mortgaged property." Ibanez, 941 N.E.2d at 49. Accordingly, notice language indicating that a borrower will have an opportunity to assert a defense to acceleration or foreclosure "in the foreclosure proceeding," like

the language at issue here, may mislead borrowers to wait for the nonexistent judicial foreclosure proceeding and thereby fail to bring a separate pre-foreclosure court action.[6]

Defendants cite <u>Cades v. Bank of New York Mellon</u>, 2013 WL 6212592, at *2 (D. Mass. Nov. 29, 2013), for the proposition that "[s]trict compliance does not necessarily mean punctilious compliance, if with minor deviations from language described in the Act, there is still substantial, clear disclosure of the fact or information demanded by the applicable statute or regulation." <u>Id.</u> (quoting <u>Santos-Rodriguez v. DoralMortg. Corp.</u>, 485 F.3d 12, 17 (1st Cir. 2007) (construing Truth in Lending Act standard)). The facts of <u>Cades</u>, however, are materially distinguishable. The notice there stated "you <u>may</u> have the right to bring a court action," while the mortgage provided that the "notice <u>shall</u> inform Borrower of . . . the right to bring a court action." <u>Id.</u> In contrast, as discussed, the notice here completely failed to inform the borrowers of any right to bring a court action and instead indicated there would be a judicial foreclosure proceeding, a much more perilous deviation than in <u>Cades</u>.

The more difficult, and unsettled, question is whether M.G.L. c. 183, § 21 requires strict compliance with all the terms of the mortgage or merely those terms "relating to the foreclosure of mortgages by the exercise of a power of sale." As a matter of statutory interpretation, Plaintiffs' argument, that the limiting phrase "relating to the foreclosure of mortgages by the exercise of a power of sale" does not apply to "the terms of the mortgage" but only to "the statutes," is appealing. The statute states the foreclosing entity must first comply "<u>with</u> the terms of the mortgage and <u>with</u> the statutes relating to the foreclosure of mortgages by the exercise of a power of sale." MASS. GEN. LAWS ch. 183, § 21 (emphasis added). It does not, by its terms, state that the entity must merely comply "with the terms of the mortgage relating to the foreclosure of mortgages

---

[6] Plaintiffs here did bring the pre-foreclosure action that paragraph 22 sought to protect, which is why their breach of contract claim fails for lack of harm. That Plaintiffs were not harmed by the deficient notice, however, does not mean that Defendants strictly or substantially complied with paragraph 22.

by the exercise of a power of sale."  The legislature's twice inserting the word "with" signifies a greater severance between the phrases.  This construction is also consistent with the policy that, because of the "substantial power" to foreclose without prior judicial oversight, mortgagees ought to be especially scrupulous in carrying out the foreclosure process.  See Ibanez, 941 N.E.2d at 49-50.[7]

Further, even if Defendants were correct that strict compliance is only required as to the mortgage terms "relating to the . . . exercise of a power of sale," the court cannot conclude, at this stage of the litigation, that paragraph 22 is not such a term.  Paragraph 22 is the only section in the mortgage which specifically mentions the power of sale.  See Ibanez, 941 N.E.2d at 49 ("Where a mortgage grants a mortgage holder the power of sale, . . . it includes by reference the power of sale set out in G.L. C. 183, § 21, and further regulated by G.L. c. 244, §§ 11-17C.").

The Supreme Judicial Court held in U.S. Bank Nat'l Ass'n v. Schumacher, 5 N.E.3d 882, 890 (Mass. 2014), that M.G.L. c. 244, § 35A—which mandates a similar (but not identical) pre-foreclosure notice as that required by paragraph 22—"is not one of the statutes 'relating to the foreclosure of mortgages by the exercise of a power of sale'" under M.G.L. c. 183, § 21.  Defendants assert the same conclusion is warranted here as to paragraph 22.  The difference, however, is that § 35A is a relatively recent statute that operates independently of the statutory power of sale, which is explicitly regulated by separate statutes: M.G.L. c. 183, § 21 and M.G.L. c. 244, §§ 11-17C.  See Eaton, 969 N.E.2d at 1128; Ibanez, 941 N.E.2d at 49.  In contrast, paragraph 22 is written with a grammatical structure supporting the inference that the notice provision may relate to the exercise of the statutory power of sale, despite Schumacher's holding.[8]

---

[7] While a persuasive argument can be made that it would be unreasonable to interpret M.G.L. c. 183, § 21 to require strict compliance with every single term in the mortgage contract, even merely technical terms that provide no protections to the mortgagor, the court is not faced with such a provision.  Rather, as discussed, paragraph 22 contains significant consumer protection language, designed to inform mortgagors of their right to contest a looming foreclosure and the potential loss of their home.

[8] The court also notes that, in the mortgage foreclosure context, the concept of treating requirements contained in a mortgage contract differently from similar provisions contained in a statute finds support in two, albeit dated, Supreme Judicial Court decisions.  Compare Smith v. Provin, 86 Mass. 516, 518 (1862) (failure to comply with mortgage term

14

The weight of authority appears to side with Defendants. In particular, two recent cases Coelho v. Asset Acquisition & Resolution Entity, LLC, 2014 WL 1281513, *2-3 (D. Mass. March 31, 2014), and Pinti v. Emigrant Mortg. Co., 2013 WL 6797183 *6-8 (Mass.Super.Ct. Oct. 31, 2013), appeal pending, No. SJC-11742, held both that M.G.L. c. 183, § 21 only requires strict compliance with the mortgage terms relating to the exercise of the power of sale and that the pre-foreclosure notice provision in paragraph 22 was not such a mortgage term. But Plaintiffs, for their part, have cited a number of Housing Court decisions, both before and after Schumacher, which support their position. See, e.g., Greenwich Investors v. Schreffler, Worcester Housing Court, No. 14-SP-0835 (July 22, 2014); Reem Property LLC v. Armstrong, Boston Housing Court, No. 1384SP005450 (April 23, 2014); Spearhead Capital Corp. v. Craig, Boston Housing Court, No. 12-SP-001825 (Jan. 29, 2013). Moreover, the Supreme Judicial Court granted certiorari in Pinti, No. SJC-11742, on this precise issue and held oral argument on January 8, 2015.

Accordingly, in light of the unsettled nature of this question, the court believes it would be inappropriate to dismiss Count II at this juncture, or, indeed, to make a definitive ruling interpreting M.G.L. c. 183, § 21 as it relates the mortgage term at issue here, while the Pinti appeal is pending before the Supreme Judicial Court. Cf. Commerce Oil Refining Corp. v. Miner, 303 F.2d 125, 128 (1st Cir. 1962). The court will therefore deny that portion of Defendants' motion which seeks to dismiss Count II.

### C. Violation of M.G.L. c. 244, § 35A (Count III)

Plaintiffs allege Defendants violated M.G.L. c. 244, § 35A by: wrongfully informing them the entire amount of the loan would be accelerated if they failed to cure the default within 35 days;

---

requiring an affidavit to be recorded within one year of auction voided the foreclosure), with Field v. Gooding, 106 Mass. 310, 312-13 (1871) (failure to comply with statute requiring an affidavit to be recorded within thirty days of auction did not void the foreclosure).

failing to provide them with the name and address of the current mortgagee; and sending two separate, conflicting past due amounts in the notices. As a result, Plaintiffs allege, Defendants have failed to provide them with notice that complies with § 35A, and Defendants were not entitled to accelerate payment or enforce the First Mortgage.

Defendants seek dismissal on the grounds that strict compliance is not required under Schumacher and, therefore, Plaintiffs must allege some prejudice or harm, which they have not done. Defendants also argue that under Haskins v. Deutsche Bank Nat'l Trust Co., 19 N.E.3d 455, 462 (2014), the mortgagee listed in the notice was not incorrect and the notice listed the contact information for Nationstar, which, as the servicer at the time, also constituted a "mortgagee" for purposes of § 35A. In addition, Defendants argue they sent two notices on August 21, 2013, one which provided a 35-day cure period and was not sent pursuant to § 35A but instead pursuant to paragraph 22, and another which provided a 150-day cure period and was sent pursuant to § 35A. As for the conflicting past due amounts, Defendants argue that the difference, $70, was immaterial and did not in any way prejudice Plaintiffs.

Under M.G.L. c. 244, § 35A(g), "[t]he mortgagee, or anyone holding thereunder, shall not accelerate maturity of the unpaid balance of [a] mortgage obligation or otherwise enforce the mortgage . . . until at least 150 days after the date a written notice is given by the mortgagee to the mortgagor." Section 35A(h), in turn, describes the information that must be included in the notice, including

> (1) the nature of the default . . . and of the mortgagor's right to cure the default by paying the sum of money required to cure the default; (2) the date by which the mortgagor shall cure the default to avoid acceleration, a foreclosure or other action to seize the home, which date shall not be less than 150 days after service of the notice . . . (4) the name and address of the mortgagee.

MASS. GEN. LAWS ch. 244, § 35A(h).

Plaintiffs are correct that Schumacher, 5 N.E.3d at 888-890, dealt with a post-foreclosure challenge to a foreclosure sale in the context of a summary process eviction action. As such, the homeowner was required to prove the failure to strictly adhere to the statutory power of sale voided the foreclosure sale. See id. In cases brought seeking to enjoin the foreclosure before it has taken place, however, the standard is somewhat different. Thus, in a concurring opinion which was fully endorsed by the majority, id. at 889 n. 12, Justice Gants explained that

> where a homeowner who is facing foreclosure claims that the mortgage holder has failed to provide timely and adequate written notice of the right to cure the default in payment of the mortgage, in violation of § 35A, the homeowner may file an equitable action in Superior Court seeking to enjoin the foreclosure. Because, under § 35A(b), the mortgage holder "shall not accelerate maturity of the unpaid balance of [the] mortgage obligation or otherwise enforce the mortgage because of a default consisting of the mortgagor's failure to make any such payment" until the required time period has elapsed after the required written notice has been provided to the mortgagor by the mortgage holder, the foreclosure may not proceed if the mortgagor proves that the mortgage holder has failed to give the required notice or failed to wait the required time period. If the mortgagor proves a violation of § 35A, the mortgage holder must provide the proper notice required by § 35A and wait to see if the borrower will cure the default within the required time period before recommencing the foreclosure proceeding.

Id. at 890.

Accordingly, in Haskins, the Massachusetts Appeals Court explained that "the present case is in precisely the posture recognized by the court in Schumacher as appropriate to challenge the validity of a § 35A notice in order to prevent a foreclosure sale from going forward." Haskins, 19 N.E.3d at 459. And while the Haskins court did not resolve the exact standard for such claims, because it concluded that the notice in that case complied with § 35A, id. at 460 n.11, it stated that "the standard of 'fundamental unfairness' furnishes too narrow a lens through which to view potential grounds for relief based on a defective notice."[9] Id. at 459-60; see also Bulmer v. MidFirst

---

[9] The "fundamental unfairness" standard was adopted by Justice Gants, and the full majority, with regard to post-foreclosure claims in the summary process context which seek to set aside foreclosures based on violations of § 35A. See Schumacher, 5 N.E.3d at 891 ("[T]o defeat the eviction, the defendant must prove that the violation of § 35A rendered the foreclosure so fundamentally unfair that she is entitled to affirmative equitable relief, specifically the setting

<u>Bank, FSA</u>, --- F.Supp.3d ----, 2014 WL 6070695, at *10 (D. Mass. Nov. 14, 2014) ("Justice Gants

did not define 'adequate written notice,' but he appears to have reasonably chosen a lower hurdle for

relief in the <u>pre-foreclosure</u> than in the <u>post-foreclosure</u> context. This stands to reason; it should be

more difficult to undo a foreclosure which has already taken place than to forestall a pending one.").

Indeed, the Massachusetts Appeals Court, in another decision, suggested that no harm is required

whatsoever for a § 35A claim in this context, thereby evoking a standard which is similar (if not

equivalent) to the strict compliance standard applied to void a foreclosure under M.G.L. c. 183, § 21.

<u>See</u> <u>Bank of New York Mellon Corp. v. Wain</u>, 11 N.E.3d 633, 636-37 (Mass.App.Ct. 2014)

("[W]here the notice to cure letter sent to a mortgagor does not fully comply with G.L. c. 244, §

35A, the mortgagor has the right to bring an equitable action in Superior Court to enjoin the

threatened foreclosure. . . . However, in a postforeclosure action, it is not enough for the mortgagor

merely to show some noncompliance with § 35A." (internal citations omitted)). In light of Justice

Gants' concurrence—in which he nowhere mentioned the concept of prejudice or harm for this

type of pre-foreclosure claim—and the cases construing it, the court will not hold Plaintiffs to a

harm requirement.

 As to the alleged § 35A violations, even assuming that Defendants complied with §

35A(h)(4) by providing the name and address of the mortgage servicer, <u>see</u> <u>Haskins</u>, 19 N.E.3d at

462-63,[10] the court concludes that Plaintiffs have adequately alleged violations of §§ 35A(h)(1) and

(2). As mentioned, § 35A(h)(2) requires that the notice describe "the date by which the mortgagor

---

aside of the foreclosure sale 'for reasons other than failure to comply strictly with the power of sale provided in the mortgage.'" (quoting <u>Bank of Am., N.A. v. Rosa</u>, 999 N.E.2d 1080, 1088 (Mass. 2013))).

[10] Contrary to Plaintiffs' argument, <u>Haskins</u> does apply to notices sent after publication of the Supreme Judicial Court's decision in <u>Eaton</u>, 969 N.E.2d 1118. In short, the two decisions addressed separate statutory provisions. <u>See</u> <u>id.</u> at 1129-30, 1133 (defining "mortgagee" for purposes of M.G.L. c. 244, § 14 as the entity that holds both the mortgage and the mortgage note, but holding that the definition would only be applied prospectively); <u>Haskins</u>, 19 N.E.3d at 462-63 (defining "mortgagee" for purposes of M.G.L. c. 244, § 35A as including the mortgage servicer in light of the purpose of § 35A to provide the "mortgagor with the information necessary to contact the party from whom information about the loan may be obtained, to whom any curative payment may be made, or with whom modification discussions might be conducted," and also relying on the definition of "mortgagee" found in the applicable regulation: 209 C.M.R. § 56.02).

shall cure the default to avoid acceleration, a foreclosure or other action to seize the home, which date shall not be less than 150 days after service of the notice." MASS. GEN. LAWS ch. 244, § 35A(h)(2). Here, Plaintiffs received two notices which provided separate cure dates: one listed 35 days, and another listed 150 days. While Defendants contend that they in fact complied with § 35A by virtue of the notice listing a 150-day cure period, the court does not agree. If mortgagees could skirt the requirements of § 35A by sending separate, contradictory notices alongside required notices, as allegedly occurred here, such conduct would obfuscate the rights mortgagors enjoy under the statute, thereby defeating the purpose of the notice in the first place. Moreover, contrary to Defendants' suggestion, paragraph 22 of the mortgage contract does not mandate the notice required thereunder provide a 35-day cure period; rather, it merely states that the notice provide a cure date "not less than 30 days from the date" of the notice. (Dkt. No. 1-3, Ex. 6.) Accordingly, nothing prevented Defendants from coordinating the notices required by both § 35A and paragraph 22 (or, perhaps, from sending one combined notice), so as to avoid confusion and provide consistent information to Plaintiffs.

The same analysis applies to § 35A(h)(1). That provision, as mentioned, requires that the notice describe "the nature of the default . . . and of the mortgagor's right to cure the default by paying the sum of money required to cure the default." MASS. GEN. LAWS ch. 244, § 35A(h)(1). Again, as Plaintiffs allege, the two August 21, 2013 notices provided different pay-off amounts. And while the court recognizes that the difference here was not substantial, Plaintiffs were still entitled to receive an accurate pay-off balance before acceleration of the loan, and, obviously, at least one of the notices listed an inaccurate amount. See Bulmer, 2014 WL 6070695, at *10 ("It is clear to this court, however, that a notice of a right-to-cure which sets forth the wrong amount due is at odds with the governing statute . . . .") Accordingly, the court denies that portion of Defendants' motion which seeks to dismiss Count III of the amended complaint.

D. Violation of M.G.L. c. 244, § 35B (Count IV)

Plaintiffs allege that Defendants violated M.G.L. c. 244, § 35B by failing to take reasonable steps to make a good faith effort to avoid foreclosure. Moreover, Plaintiffs allege that Defendants wrongfully refused to process mortgage loan modification applications without receipt of certain documentation not required by § 35B(c), including documentation of income and expenses of Beck, as well as documentation they had already submitted. In addition, Plaintiffs allege, following receipt of the HAMP modification application in August, 2013, Defendants failed to provide a written assessment of Plaintiffs' ability to make an affordable monthly payment or a notice that no modified mortgage loan would be offered, in violation of §§ 35B(b) and (c).

Defendants argue that this claim fails because Plaintiffs already received a "modified mortgage loan" under Section 35B(a), and, under Section 35B(c), Defendants had no obligation to grant another modification within three years. The court agrees.[11]

Under M.G.L. c. 244, § 35B(b), a creditor "shall not cause publication of notice of a foreclosure sale, as required by section 14, upon certain mortgage loans unless it has first taken reasonable steps and made a good faith effort to avoid foreclosure." Moreover, § 35B(c) provides that "[u]nder this section, for certain mortgage loans, the creditor shall send notice, concurrently with the notice required by subsection (g) of section 35A, of the borrower's rights to pursue a modified mortgage loan." Mass. Gen. Laws ch. 244, § 35B(c). The creditor is also obligated to provide borrowers, following receipt of the borrower's notification of intent to pursue a modified mortgage loan, with a written assessment of the borrowers' eligibility for a modified mortgage loan incorporating a number of factors. Id.

---

[11] Defendants also press other grounds for dismissing this claim, namely, that the terms of the loan as modified by the Loan Modification Agreement do not qualify as a "certain mortgage loan" under § 35B(b) and that Plaintiffs were required to provide financial documentation for Beck. Because the court agrees with Defendants' first argument, it need not address these additional arguments.

The statute provides, however, that "[t]he right to a modified mortgage loan, as described in this section, shall be granted once during any 3-year period, regardless of the mortgage holder." Id.; see also 209 C.M.R. 56.05(2) ("The right to request a mortgage loan modification shall be granted to a borrower once during any three year period, regardless of mortgage holder."). Under § 35B(a), a "modified mortgage loan" is defined as

> a mortgage loan modified from its original terms including, but not limited to, a loan modified under 1 of the following: (i) the Home Affordable Modification Program; (ii) the Federal Deposit Insurance Corporation's Loan Modification Program; (iii) any modification program that a lender uses which is based on accepted principles and the safety and soundness of the institution and authorized by the National Credit Union Administration, the division of banks or any other instrumentality of the commonwealth; (iv) the Federal Housing Administration; or (v) a similar federal loan modification plan.

MASS. GEN. LAWS ch. 244, § 35B(a); see also 209 C.M.R. 56.02.

Plaintiffs concede in their amended complaint that they accepted the Loan Modification Agreement in February, 2012, less than three years before they commenced the present action. (Dkt. No. 16, Am. Compl. ¶ 31.) Accordingly, under the plain language of M.G.L. c. 244, § 35B(c), Plaintiffs had no right to another modified mortgage loan until February, 2015. Granted, Plaintiffs argue that the Loan Modification Agreement was not a "modified mortgage loan," as defined by the statute, because it was not affordable. Even assuming that affordability is relevant to the definition of "modified mortgage loan,"[12] Plaintiffs' conclusory assertion in this regard is insufficient to avoid dismissal. In particular, both the statute and the applicable regulation set forth specific definitions for "affordable monthly payment," see MASS. GEN. LAWS ch. 244, § 35B(a); 209 C.M.R. 56.02, and Plaintiffs have not explained why the payments required by the Loan Modification Agreement fall outside of these definitions. Moreover, while the Loan Modification Agreement increased Plaintiffs'

---

[12] As Plaintiffs point out, M.G.L. c. 244, § 35B(b)(1) provides that "[a]ny modified mortgage loan offered to the borrower shall comply with current federal and state law, including, but not limited to, all rules and regulations pertaining to mortgage loans and the borrower shall be able to reasonably afford to repay the modified mortgage loan according to its scheduled payments." Interestingly, however, the affordability requirement did not make its way into the definition of "modified mortgage loan" or the provision stating that the right to a modified mortgage loan is only available once every three years. See MASS. GEN. LAWS ch. 244, §§ 35B(a) and (c).

monthly payments by approximately $400 per month, the modification lowered the interest rate and

actually lowered the payments compared to the amount they were scheduled to increase to in 2015.

(Dkt. No. 11, Mem. in Supp. of Defs.' Mot. to Dismiss, Ex. A.)[13]

The court recognizes that there is some unfairness between Defendants' statements,

contained in the March and August of 2013 letters, that Plaintiffs were eligible to apply for a

mortgage modification and their current reliance on the three-year limitation. Plaintiffs' argument in

this regard, however, is more appropriately directed toward their claim under M.G.L. c. 93A. It does

not, in the court's view, provide an independent basis for liability under § 35B. Simply stated,

Plaintiffs' acceptance of the Loan Modification Agreement took them outside of the protection of

the statutory scheme until February, 2015. See Stoke v. Wells Fargo Bank, N.A., --- F.Supp.2d ----,

2014 WL 2649509, at *8 (D. Mass. June 12, 2014).

Accordingly, the court will dismiss without prejudice Count IV of the amended complaint.


E. Wrongful Foreclosure (Count V)

Plaintiffs allege the assignment of the First Mortgage to Bank of New York over eight years

after the Closing Date of the Trust violated the terms of the PSA and the Tax Code. Furthermore,

Plaintiffs assert that Bank of New York's acceptance of the conveyance was an ultra vires action and

void under New York law. Because the conveyance is void, Plaintiffs continue, Bank of New York

is not the holder or owner of the First Mortgage and has no legal power to exercise the power of

sale in the First Mortgage.

In seeking dismissal of this claim, Defendants argue Plaintiffs do not have standing to

challenge the assignment because any violation of the PSA merely renders the assignment voidable.

---

[13] Although Plaintiffs did not provide the court with a copy of the Loan Modification Agreement, they did specifically
refer to it in their amended complaint. (Dkt. No. 16, Am. Compl. ¶¶ 28-33.) Accordingly, because Defendants attached
the document to their original motion to dismiss and Plaintiffs do not dispute its authenticity, the court has reviewed it.
See Trans-Spec Truck Serv., Inc., 524 F.3d at 321.

The First Circuit has explained that "standing [is] appropriate in instances where a mortgagor 'challenge[s] a mortgage assignment as invalid, ineffective, or void,' although not where the challenge would 'render [the assignment] merely voidable . . . but otherwise effective to pass legal title." Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 354 (1st Cir. 2013) (quoting Culhane v. Aurora Loan Servs. of Nebraska, 708 F.3d 282, 291 (1st Cir. 2013)). "Thus, claims that merely assert procedural infirmities in the assignment of a mortgage, such as a failure to abide by the terms of a governing trust agreement, are barred for lack of standing." Id.

As Defendants explain, the vast majority of courts to have considered Plaintiffs' argument regarding noncompliance with the PSA under New York trust law have held that such challenges merely render the assignment voidable and, thus, do not support standing. The Second Circuit, addressing this same "theory that a mortgagor has standing to 'challenge[] a mortgage assignment as invalid, ineffective, or void'" under Woods, recently explained that "the weight of New York authority is contrary to Plaintiffs' contention that any failure to comply with the terms of the PSAs rendered defendants' acquisition of plaintiffs' loans and mortgages void as a matter of trust law." Rajamin v. Deutsche Bank Nat'l Trust Co., 757 F.3d 79, 88 (2d Cir. 2014). Courts in this district applying New York trust law have reached the same conclusion. See, e.g., Cades, 2013 WL 6212592, at *4; Halacy v. Wells Fargo Bank, N.A., 2013 WL 6152351, at *3-4 (D. Mass. Nov. 21, 2013); Orellana v. Deutsche Bank Nat. Trust Co., 2013 WL 5348596, at *5 n.13 (D. Mass. Aug. 30, 2013); Koufos v. U.S. Bank, 939 F.Supp.2d 40, 57 n.2 (D. Mass. 2013).

Plaintiffs rely on the one New York state trial court decision which has held the opposite: Wells Fargo Bank, N.A. v. Erobobo, 2013 WL 1831799, at *8-9 (N.Y.Sup.Ct. April 29, 2013. But a chorus of courts, both within and outside of New York, have specifically rejected Erobobo. See, e.g., Rajamin, 757 F.3d at 89-90 (finding Erobobo's reasoning unpersuasive because the decision failed to discuss New York authorities holding "that the beneficiaries may ratify otherwise

23

unauthorized acts of the trustee," no New York appellate decision has endorsed <u>Erobobo</u>'s interpretation of N.Y. Est. Powers & Trusts Law [("EPTL")] § 7-2.4, "[a]nd most courts in other jurisdictions discussing that section have interpreted New York law to mean that a transfer into a trust that violates the terms of a PSA is voidable rather than void" (internal quotation marks omitted)); <u>Halacy</u>, 2013 WL 6152351, at *3. Indeed, the First Circuit has "note[d] without decision . . . that the vast majority of courts to consider the issue have rejected <u>Erobobo</u>'s reasoning, determining that despite the express terms of [EPTL] § 7-2.4, the acts of a trustee in contravention of a trust may be ratified, and are thus voidable." <u>Butler v. Deutsche Bank Trust Co. Americas</u>, 748 F.3d 28, 37 (1st Cir. 2014).

Plaintiffs argue that the concept of ratification should not apply here because of the practical difficulties of ratification in this context. In particular, they argue the beneficiaries which would have to ratify such "voidable" acts number in the hundreds or thousands, because they are the investors who purchased the residential mortgage-backed securities issued by the Trust. Plaintiffs, however, appear to have missed the point. "Where an act can be ratified, it is voidable rather than void." <u>Anh Nguyet Tran v. Bank of New York</u>, 2014 WL 1225575, at *5 (S.D.N.Y. March 24, 2014). "Notably, trust beneficiaries need not <u>actually</u> ratify the act to render an act voidable and therefore outside the scope of EPTL § 7-2.4, rather, the fact that trust beneficiaries <u>could</u> ratify such an act is sufficient to render it voidable." <u>Id.</u>

As a result, Plaintiffs lack standing to assert their challenge to the mortgage assignment. The court will therefore dismiss Count V of the amended complaint.


F.  <u>Breach of Implied Covenant of Good Faith and Fair Dealing (Count VI)</u>

Plaintiffs allege that Defendants breached the covenant of good faith and fair dealing by accelerating the loan and proceeding with the foreclosure without complying with the mortgage

terms, by not complying with the applicable notice requirements, by publishing notices without taking reasonable steps to avoid foreclosure, by refusing to process Plaintiffs' HAMP application and violating HAMP guidelines, and by proceeding with the foreclosure while the HAMP application was still pending.

Defendants argue, citing MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486, 492-93 (1st Cir. 2013), this claim is subject to dismissal because the covenant of good faith and fair dealing does not extend beyond the scope of the contract. Defendants also argue that Plaintiffs have failed to allege facts demonstrating bad faith.

"Every contract in Massachusetts is subject, to some extent, to an implied covenant of good faith and fair dealing." Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 683 (Mass. 2005). "The implied covenant provides 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .'" Weiler v. PortfolioScope, Inc., 12 N.E.3d 354, 361 (Mass. 2014) (quoting Druker v. Roland Wm. Jutras Assocs., Inc., 348 N.E.2d 763, 765 (Mass. 1976)). "This implied covenant may not be 'invoked to create rights and duties not otherwise provided for in the existing contractual relationship,' . . . but rather concerns the manner of performance." Ayash, 822 N.E.2d at 684 (quoting Uno Rests., Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004)); see also MacKenzie, 738 F.3d at 493 ("'[T]he concept of good faith is shaped by the nature of the contractual relationship from which the implied covenant derives,' and the 'scope of the covenant is only as broad as the contract that governs the particular relationship.'" (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238 (1st Cir. 2013)).

In MacKenzie, the First Circuit explained that because "nothing in the mortgage impose[d] a duty on [the servicer] to consider a loan modification prior to foreclosure in the event of a default," there was no violation of the covenant of good faith and fair dealing for failing to do so.

MacKenzie, 738 F.3d at 493. Moreover, the First Circuit held that borrowers may not bring this type of claim based upon HAMP violations because they "are not third-party beneficiaries of the [Servicer Participation Agreement] between [a mortgage servicer] and the government." Id. at 491-93. Accordingly, to the extent Plaintiffs' claim relies on violations of HAMP guidelines or mortgage statutes, such allegations are insufficient because those requirements do not derive from the mortgage contract.

Plaintiffs, however, also base their claim on Defendants' acceleration of the loan without first complying with the mortgage terms, presumably the failure to send a notice in compliance with paragraph 22. Even assuming the court could infer a lack of good faith in this regard,[14] it is clear, as discussed with regard to Count I, that no harm resulted from the breach. See Ayash, 822 N.E.2d at 685-86. Rather, as mentioned, this suit is the specific pre-foreclosure court action paragraph 22 was intended to preserve. Accordingly, the court will dismiss Count VI of the amended complaint.

G. Unfair and Deceptive Business Practices in Violation of M.G.L. c. 93A (Count VII)

Plaintiffs allege that Defendants engaged in unfair and deceptive practices in violation of M.G.L. c. 93A, including: violating paragraph 22 and M.G.L. c. 183, § 21 as described in Count II; violating M.G.L. c. 244, § 35A as described in Count III; violating M.G.L. c. 244, § 35B as described in Count IV; repeatedly requesting documents and information that Plaintiffs had already provided; failing to respond to Plaintiffs' requests in a timely fashion; requiring Plaintiffs to communicate with multiple individuals with different familiarity with their mortgage; refusing to consider or offer foreclosure prevention options; violating HAMP guidelines; proceeding with the foreclosure even

---

[14] Contrary to Defendants' assertion, "'[t]here is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith. . . . The lack of good faith can be inferred from the totality of the circumstances.'" Weiler, 12 N.E.3d at 362 (quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 704 (Mass. 2010)).

though Plaintiffs' HAMP loan modification application was still pending; and proceeding with the foreclosure even though the assignment to Bank of New York is void.

Defendants seek dismissal of this claim on a number of grounds. First, they contend that something more than mere violations of Massachusetts foreclosure laws is required to state a Chapter 93A claim. Second, Defendants argue the allegations regarding HAMP violations are also insufficient to support a Chapter 93A claim, citing <u>Morris v. BAC Home Loans Servicing L.P.</u>, 775 F.Supp.2d 255, 263 (D. Mass. 2011). Third, Defendants dispute the assertion that they proceeded with foreclosure even though Plaintiffs' HAMP application was still pending. Fourth, they argue not all the allegations in this count were contained in Plaintiffs' demand letter and, as such, these allegations may not be considered. Fifth, Defendants argue Plaintiffs have failed to plead facts suggesting bad faith. Sixth, they assert that Plaintiffs failed to reasonably describe any injury or harm in the demand letter. Finally, Defendants argue that Plaintiffs cannot demonstrate causation because the true cause of their failure to obtain a loan modification was their delinquency and there are no allegations that Plaintiffs would qualify for another loan modification that they would have honored.

Chapter 93A provides consumers with a private right of action as to "unfair and deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ch. 93A, §§ 2, 11. "To prove such a claim, it is neither necessary nor sufficient that a particular act or practice violate common or statutory law." <u>Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.</u>, 552 F.3d 47, 69 (1st Cir. 2009). "Massachusetts courts evaluate unfair and deceptive trade practice claims based on the circumstances of each case," leaving "the determination of what constitutes an unfair trade practice to the finder of fact, subject to the court's performance of a legal gate-keeping function." <u>Id.</u> The following factors apply to such a determination: "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it

causes substantial injury to consumers (or competitors or other businessmen)." Id. (internal quotation marks omitted).

While it is true that "not every technical violation of HAMP should expose a servicer to Chapter 93A liability," Morris, 775 F.Supp.2d at 263, and that "[s]omething more" than a mere violation of Massachusetts foreclosure law is required, Woods, 733 F.3d at 358 (quoting Juarez v. Select Portfolio Servicing, 708 F.3d 269, 281 (1st Cir. 2013)), Plaintiffs are correct that such violations may support Chapter 93A claims when they are inherently unfair and deceptive. See, e.g., Kozaryn v. Ocwen Loan Servicing, LLC, 784 F.Supp.2d 100, 102 (D. Mass. 2011). Here, the court concludes, Plaintiffs have alleged sufficient facts to state a Chapter 93A claim.

Contrary to Defendants' assertions, "the relevant conduct is the entirety of defendants' actions, not each action viewed in isolation." Hannigan v. Bank of Am., N.A., --- F.Supp.3d ----, 2014 WL 4783635, at *6 (D. Mass. Sept. 24, 2014). In this regard, Plaintiffs have alleged conduct on Defendants' part characterized by delay, evasiveness, and misrepresentation in processing Plaintiffs' various loan modification applications. Such conduct plausibly supports a Chapter 93A claim. See Charest v. Federal Nat'l Mortg. Ass'n, 9 F.Supp.3d 114, 126 (D. Mass. 2014) ("During the Charests' application processes, GMAC required unnecessary information and documents it already possessed, miscalculated Paula M. Charest's income, repeatedly misrepresented the Charests' eligibility for a loan modification and denied applications based on incorrect facts."); Hannigan, 2014 WL 4783635, at *6 ("Accepted as true at the present juncture, plaintiffs' allegations that they were unfairly strung along over the course of several years is sufficient to raise a plausible claim that defendants 'unfairly disregarded and mishandled [their] HAMP application[s].'" (quoting Morris, 775 F.Supp.2d at 262)); Dill v. Am. Home Mortg. Servicing, Inc., 935 F.Supp.2d 299, 306 (D. Mass. 2013) ("Plaintiffs have sufficiently alleged that AHMSI engaged in unfair and deceptive conduct, including misleading Plaintiffs regarding the criteria for modification and the status of their

modification application.”); <u>Stagikas v. Saxon Mortg. Servs., Inc.</u>, 2013 WL 5373275, at *4 (D. Mass. Sept. 24, 2013) (“Courts have found that when ‘defendants misrepresented to plaintiffs the status of their HAMP application, their rights under HAMP, or their eligibility for a permanent loan modification’ these acts were ‘sufficiently unfair or deceptive’ to impose c. 93A liability.” (quoting <u>Markle v. HSBC Mortg. Corp.</u>, 844 F.Supp.2d 172, 186 (D. Mass. 2011))).

Defendants’ assertion that, contrary to Plaintiffs’ complaint, they did not proceed with foreclosure while a HAMP application was still pending raises a factual dispute plainly inappropriate for resolution at the motion to dismiss stage. As to Defendants’ argument that Plaintiffs failed to include all these allegations in the Chapter 93A demand letters, the court finds that Plaintiffs in fact included the vast majority of their factual and legal bases for this claim in the letters,[15] and, for present purposes, certainly enough to state a claim. Moreover, the demand letters adequately alleged harm, namely, “the negative impact of the actions of BNY Mellon and Nationstar on [Plaintiffs’] respective credit ratings [and] the threatened loss of the equity they have built up in their home.” (Dkt. No. 11, Mem. in Supp. of Defs.’ Mot. to Dismiss Am. Compl., Exs. A and B.) <u>See</u> <u>Young</u>, 717 F.3d at 241-42. The court also concludes that Plaintiffs have pled sufficient facts to raise a plausible inference that Defendants did not act in good faith. Lastly, as to Defendants’ causation argument, the court again concludes this is a factual question simply premature for resolution at this stage.

In the end, looking at the totality of Defendants’ conduct as alleged, the court has little trouble concluding that Defendants engaged in unfair and deceptive business practices in violation of Chapter 93A. Accordingly, the court denies that portion of Defendants’ motion which seeks to dismiss Count VII of the amended complaint.

---

[15] Defendants are correct, however, that the demand letters did not include the allegation that Plaintiffs were required to communicate with multiple individuals who had different familiarity with their mortgage.

H. <u>Negligence (Count VIII)</u>

Plaintiffs allege that Defendants owed them a duty to comply with Massachusetts law governing the relationship between mortgagors and mortgagees, and that Defendants acted negligently by accelerating payment and proceeding with foreclosure without complying with the terms of the mortgage. Defendants argue this claim should be dismissed because there is no duty between a borrower and a lender, as the First Circuit explained in <u>MacKenzie</u>, 738 F.3d at 495-96.

The court agrees with Defendants. In short, Massachusetts law does not recognize the relationship of a lender and a borrower as that which gives rise to an independent duty of care. <u>See</u> <u>id.</u> at 495 ("The relationship between a borrower and lender does not give rise to a duty of care under Massachusetts law.") Accordingly, because "statutory or regulatory violations cannot give rise to a negligence claim when there is no independent duty of care between the parties," <u>id.</u>, Plaintiffs' negligence claim is not viable. The court will therefore dismiss Count VIII of the amended complaint.

V.     CONCLUSION

For these reasons, the court ALLOWS Defendants' motion to dismiss (Dkt. No. 17) with prejudice as to Counts I, V, VI, VIII, and IV, and without prejudice as to Count IV. The court, however, DENIES Defendants' motion as to Counts II, III, and VII.

It is So Ordered.

 /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge